## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DONALD L. MOORE, | : | |
| 1510 Clarendon Blvd. | : | |
| Arlington, Virginia 22209-2745 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. _____ |
| | : | |
| UNITED STATES DEPARTMENT OF | : | |
| STATE | : | |
| 2201 C Street, NW | : | **JURY TRIAL DEMAND** |
| Washington, D.C. 20520 | : | |
| | : | |
| and, | : | |
| | : | |
| REX TILLERSON, Secretary | : | |
| 2201 C Street, NW | : | |
| Washington, D.C. 20520 | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Comes now Plaintiff DONALD L. MOORE, through his attorneys with HANNON LAW GROUP, LLP, and for his Complaint against Defendants states as follows:

## INTRODUCTION

This action is for declaratory and equitable relief, and compensatory and punitive damages to redress discrimination in employment, including terms and conditions, incidents and privileges of employment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, against Defendants.

## PARTIES

1.      Donald L. Moore, ("Mr. Moore") is a resident of the Commonwealth of Virginia and a tenured Senior Foreign Service Officer (Executive Level) for the United States Department of State.  He currently serves as the Office Director of the Office of Consular and Management Liaison, Bureau of Intelligence and Research ("INR").  Mr. Moore is an African American male.

2.      Defendant is the United States Department of State ("State Department"), an agency within the United States government with its main office in Washington, D.C.

3.      Defendant Rex Tillerson is the United States Secretary of State.  Secretary Tillerson is being sued in his official capacity as the head of the United States Department of State.  Upon information and belief, Secretary Tillerson took no part in and had no knowledge of, the actions alleged in this Complaint.  He is named as a party for jurisdictional reasons only.

## JURISDICTION AND VENUE

4.      This action arises under the Constitution and laws of the United States and presents a federal question within this Court's jurisdiction under 28 U.S.C. §§ 1331, 2202; 42 U.S.C. § 2000e et seq., and 5 U.S.C. § 2302(b).

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, as Plaintiff is employed by the State Department within this district.  The Defendants operate within this district, and the actions and unlawful employment practices alleged herein were in large part committed within the District of Columbia.

6.      Plaintiff has exhausted his administrative remedies and is entitled to file this civil action pursuant to 42 U.S.C. § 2000(e).

7.    This Court has personal jurisdiction over the Defendants because the State Department operates within the geographic jurisdiction of this Court and conducts substantial business within the geographic jurisdiction of this Court.

## FACTS COMMON TO ALL COUNTS

8.    Mr. Moore is an accomplished and exceptional diplomat. He graduated from the University of Paris with an LLM in Law and obtained his Juris Doctorate from the University of Florida. Mr. Moore was a member of the Judge Advocate General's Corps of the United States Navy in Norfolk, Virginia and Naples, Italy from 1982-1988. He later served as an Assistant State's Attorney for the 15th Judicial Circuit in Florida. Mr. Moore has served the State Department with distinction since 1992. He distinguished himself through his tireless efforts on behalf on his country and received the Barbara Watson award for Consular Excellence. He received several Meritorious Honor Awards. Mr. Moore received a Superior Honor Award for leading the evacuation of U.S. citizens after the devastating 2010 Earthquake in Haiti. He was promoted into the Senior Foreign Service on his first attempt, rated 1st of the 21 Senior Officers competing.

9.    In 2010, Mr. Moore was posted to the United States Consulate in Naples, Italy, where he served as Consul General.

10.    Mr. Moore's first level supervisor in Naples was Douglas Hengel, Deputy Chief of Mission, Rome, Italy. His second level supervisor was David Thorne, United States Ambassador, Rome, Italy.

11.    In Naples, Mr. Moore supervised the entire Consulate operation, including supervising State Department employees Kerry Howard, her husband William Howard, Jeffrey

Young, and Young's wife Gabrielle Choades.  Hereinafter these individuals will be referred to as the "Low-Performing Employees."[1]  These Low-Performing Employees engaged in significant misconduct in the Consulate work place, including sexual harassment, aggressive behavior towards colleagues, harassing a management officer, inciting arguments, making false allegations, poor team building, and overall poor representation of the State Department.  Mr. Moore counseled each of the Low-Performing Employees as it became necessary.  In response to Mr. Moore's counseling and leadership activities, the Low-Performing Employees embarked on relentless, racially motivated attacks against Mr. Moore in an attempt to protect their positions with the State Department.  These attacks lasted years, and will likely continue absent responsible leadership action from the State Department.  Despite the numerous and false allegations lodged against him by the Low-Performing Employees, Mr. Moore has never been proposed for discipline as a consequences of their baseless charges.

12.    The harassment by the Low-Performing Employees included the filing of four Equal Employment Opportunity (EEO) complaints against Mr. Moore and allegations of misconduct against Mr. Moore made to the Office of Inspector General (OIG).  Mr. Moore submitted affidavits to EEO investigators in each case, and reported that the allegations were racially motivated and intended to undermine his supervision and leadership of personnel at the Naples Consulate.  They intended to "game the system", hoping that their complaints would gain credence in the EEO process and help them avoid discipline for their poor performance.

13.    Mr. Moore was accused by the Low-Performing Employees of a wide array of misconduct including entertaining prostitutes in his official residence, abuse of power,

---

[1]    Although Gabriele Choades was not an official State Department employee, she attempted to obtain a position with the Naples Consulate and will be included in the description "Low-Performing Employees" for ease of reference.

retaliation, inappropriate relationships with staff, violent acts, and mental instability.  Such abuse

of the EEO process is legendary within the State Department.  The Low-Performing Employees

understood that, because Mr. Moore was a single, black male in the predominately white Foreign

Service, accusing him of racially stereotypical behavior would play into the racist culture at the

State Department.  In turn, this would allow them to perservere in their jobs and effectively deny

Mr. Moore the ability to lead the Consulate to meet the high standards of performance expected

in the State Department.

14.     William and Kerry Howard also complained to Senator Rand Paul in their efforts

to hurt Mr. Moore's reputation.  They offered salacious rumors about Mr. Moore and requested

Senator Paul demand the State Department rectify the alleged atrocities which they knew were

fictitious.

15.     In early 2013, upon a congressional referral to investigate the Low-Performing

Employees' allegations against Mr. Moore, the Bureau of Diplomatic Security (DS) investigated

and found the preposterous accusations meritless.

16.     Backed by the findings of Diplomatic Security, Mr. Moore asked the leadership in

Italy for their public support; however, as a black, single male posted in Europe, he was treated

as if he were radioactive.  Not only did they shirk their responsibility to provide leadership and

support Mr. Moore, James Herman, Executive Director of Consular Affairs, expressed doubts as

to Mr. Moore's innocence.  On April 5, 2013, he blithely stated that considering "Don's corridor

reputation, there was nothing in the allegations I saw yesterday that surprised me."  Despite the

exoneration of Mr. Moore by the Office of Diplomatic Security, Herman even reported his

assessment to Hans Klemm, Marcia Bernicat, Margaret Uyehara, Francisca Helmer, Stacy Hauf,

and Anne Joyce, influential State Department officials, when he knew Mr. Moore was lobbying for future assignments and knew full well the importance of an employee's "corridor reputation" in the assignment process.

17.     Kerry Howard, likely frustrated with the confidentiality of the EEO process, accelerated her allegations by going to the Italian press in order to destroy Mr. Moore's reputation.  She knew that the inflammatory publicity generated in the Italian press would likely cause State Department officials to steer clear of supporting a black man assigned as Consul General in Naples, Italy.  Over 60 articles concerning the false allegations have appeared in the Italian press.  Kerry Howard furthered her derogatory publicity scheme with stories in the New York Post, and Fox News.  On June 16, 2013 an article appeared in the New York Post, titled, "Whistleblower Accuses Consul General of Trysts with Subordinates and Prostitutes."  Also on June 16, 2013 an article appeared on Fox News' website, Fox Nation, titled, "Whistleblower Accuses Consul General of Trysts with Subordinates and Hookers."

18.     When Kerry Howard's media assault reached the United States, Department officials and the Bureau of European and Eurasian Affairs (EUR) attempted to determine how to handle the negative publicity.  Between June 14-17, 2013, they discussed at length whether to issue a comprehensive, official response to the allegations Kerry Howard made to the press. This response would have included the fact that DS investigated the allegations and found no misconduct by Mr. Moore.  On June 17, 2013, the Office of Diplomatic Security, the Office of Civil Rights (S/OCR), Deputy Chief of Mission Hengel, and Kathleen Doherty, Deputy Assistant Secretary of the Bureau of European and Eurasian Affairs, cleared a statement which explained that Diplomatic Security investigated the allegations, and there was no evidence of wrong-doing

or violations of law by Mr. Moore.  However, these high-level State Department officials in

Washington, D.C., ultimately adopted the attitude of Mr. Moore's supervisors and said nothing

in support of Mr. Moore.

19.      State Department policy mandates employees refrain from speaking to the media.

Mr. Moore diligently followed this policy, while asking Department officials so speak out in his

defense.  The State Department, on the other hand, despite knowing that the Office of Diplomatic

Security had exonerated Mr. Moore, refused any public statement of support for Mr. Moore,

allowing him to fall further into disrepute due to its deafening silence.  The State Department

refused to refute the allegations of the Low-Performing Employees, while it simultaneously

refused to let Mr. Moore speak for himself.

20.      In contrast, the State Department has protected and defended its Caucasian

officials.  For example, on June 11, 2013, United States Ambassador to Belgium, Howard

Gutman, was besieged by scandalous allegations of soliciting prostitutes.  He was allowed by the

State Department to publicly announce, "I am angered and saddened by the baseless allegations

that have appeared in the press and to watch the four years I have proudly served in Belgium

smeared is devastating."

21.      In the midst of the Low-Performing Employees' fabricated scandal, Mr. Moore

was trying to obtain an onward assignment.  No mission would touch him due to the false rumors

the State Department refused to publicly refute.  In the end, the State Department was forced to

detail Mr. Moore to a dead-end position at the Air University (U.S. Air Force) in Montgomery,

Alabama.  Due to the false rumors, the Air University initially rejected the detail of Mr. Moore.

They eventually relented; however, the Air University refused to allow Mr. Moore to participate

in public outreach and presentations due to his reputation.  The State Department did nothing to support him in this position, and the Air University did everything it could to hide Mr. Moore.

22.    Having endured well over a year of living under the shadow of unrebutted and scurrilous accusations from these Low-Performing Employees, in August of 2013, Mr. Moore sought out then Acting Director General Hans Klemm and then Deputy Assistant Secretary in the Director's Office Marcia Bernicat to obtain formal endorsement from the State Department to rehabilitate his reputation and career for onward assignments.  Instead, they berated him as a consequence of the rumors promulgated in Naples.  Specifically, Acting Director Klemm described the environment surrounding Mr. Moore's time in Naples as poisonous.  Deputy Assistant Secretary Bernicat warned Mr. Moore that when he went to his next assignment in Montgomery, Alabama, he should be sure not to procure prostitutes.

23.    Also in August of 2013, Mr. Moore scheduled a meeting with Deputy Assistant Secretary of the Visa Office, Edward Ramotowski to obtain support for a position in the Visa office.  However, Deputy Assistant Secretary Ramotowski cancelled the meeting without explanation.   Mr. Moore subsequently met with both Deputy Assistant Secretary Michelle Barnes and Assistant Secretary Janice Jacobs because in order to obtain promotions, he needed the support of high-level State Department officials.  At this meeting, they told Mr. Moore that because of his "modeling" and reputation, they were not going to give him positive consideration for onward assignments.

24.    In October of 2013, James Herman, Executive Director of Consular Affairs, sent Mr. Moore's colleague a message requesting an assessment of Mr. Moore.  This request was highly irregular and inconsistent with regular policy as Mr. Moore had not yet placed his bids.

8

25.     On October 16, 2013, the State Department's Office of Civil Rights dismissed Kerry Howard's EEO complaint as meritless.  Yet again, no effort was made at a public statement of support for Mr. Moore.

26.     Meanwhile, the lies concerning Mr. Moore's period in Naples spread insidiously in the media.  On October 21, 2013, an article appeared on Examiner.com, titled, "Critics: Clinton State Department Swept Sex Scandals Under the Rug."

27.     Mr. Moore was stymied by the State Department's refusal to remedy the damage done by its own employees to Mr. Moore's reputation and his opportunity for advancement. Hoping the EEO process would serve him as it had other employees, he filed his own EEO complaint in the fall of 2013.  Mr. Moore was not represented by counsel in the proceeding.  In his complaint, Mr. Moore alleged unlawful discrimination, and sought corrections to negative evaluations, assistance with job placement, and a public statement from the State Department exonerating him in regard to the Low-Performing Employees' allegations.

28.     Without the benefit of counsel, he was railroaded into a mediation process. During this mediation, the State Department was represented by Responding Officials Hans G. Klemm, Douglas C. Hengel, Margaret A. Uyehara, Denise A. Urs, HR Representative Mary J. Alderete, Resolving Official Marcia S. Bernicat, and Mediators Julia Mankata-Tamakloe and Arlene Brandon as participants.  Such impressive representation, although intimidating, gave Mr. Moore the impression he was being taken seriously by those able to restore his reputation. However, during the mediation no one disclosed to Mr. Moore that Kerry Howard had been issued a right to sue letter by the Office of Civil Rights and would likely file a public complaint in federal court.  No one explained to him that this would likely generate further adverse

9

publicity.  On the other hand, no one suggested that defending against her publicly filed lawsuit would enable the State Department to publicly exonerate Mr. Moore.  Without this information, and the benefit of his own counsel, Mr. Moore signed a settlement agreement with the State Department in November of 2013.

29.     The 2013 settlement agreement stated, in part, that "EUR-IO/EX will issue a memorandum to Donald L. Moore summarizing the results of the Bureau of Diplomatic Security's investigation of matters which occurred in Naples during his tour as Consul General." It also provided Mr. Douglas Hengel would "review Donald L. Moore's proposed changes to his 2012 Employee Evaluation Report (EER) and consider making respective changes."  Mr. Moore was to "submit to Douglas C. Hengel, former DCM of Naples, his proposed changes to his 2012 EER within thirty (30) calendar days following execution of this Agreement."

30.     The State Department then proceeded to render the DS memorandum, and 2013 settlement, useless.  Management refused to clearly explain to Mr. Moore how he might use the memorandum.  At first, the office told Mr. Moore that if he was in possession of the release, it was his to use.  Subsequently, the Director General's office informed Mr. Moore this was incorrect.  Next, the office instructed Mr. Moore to speak with EUR/EX, because that office could tell Mr. Moore how to handle a press release.  EUR/EX informed Mr. Moore that he needed the Department's permission to communicate with the press.  EUR/EX also insisted that the memo could only be released if it reflected the contents were solely Mr. Moore's opinions, and not the position or an official statement of the Department.  Subsequently, the DS memorandum was effectively useless, and this part of the 2013 settlement was breached.  The agreement regarding Mr. Moore's 2012 EER(s) was also unsatisfied.  The changes were never

made due to the State Department's deceptiveness regarding the status of Kerry Howard's EEO complaint, and Mr. Moore's subsequent depression caused by the State Department's inaction. On February 1 and May 10 of 2016, Mr. Moore wrote to the Office of Civil Rights, asserting his belief that the settlement was breached.

31.     When Mr. Moore returned from detail to the Air University, the assault on his career continued.  Upon information and belief, Mr. Moore's reviewer received from an unknown source negative news articles about Mr. Moore.

32.     Kerry Howard filed her federal lawsuit on January 10, 2014, which was eventually transferred to the United States District Court for the District of Columbia.  Although Mr. Moore was not a defendant in the lawsuit, Kerry Howard repeated all of the false and scandalous accusations in the public filing that she had promulgated in Naples and the European and United States press.

33.     In the midst of Kerry Howard's lawsuit, another article ran in the New York Post, titled "American Diplomat Ran Consulate Like Party Pad", and on April 7, 2014 an article ran in Newsweek, titled "Whistle-Blower Says Diplomat Turned Naples Consul into Personal Bordello."

34.     In frustration, Mr. Moore then retained his own attorney in an attempt to have his name exonerated through the public litigation filed by Howard.

35.     Although the State Department knew the Howard lawsuit was worse than frivolous, the Department chose to pay money to Howard to settle the case, without notice to Mr. Moore and over his previously stated objections.  This settlement, to the public, all but admitted the misconduct of Mr. Moore and was the kiss of death to his reputation.

36.     After Mr. Moore learned of Kerry Howard's settlement, he visited Heather

Townsend of the Executive Office for the Bureau of European Affairs.  Mr. Moore asked for a

statement to be released to the press reporting that he had been exonerated of Kerry Howard's

false allegations by the Office of Diplomatic Security.  Ms. Townsend refused.  Mr. Moore made

clear that the un-remediated years-long attack on his character by the Low-Performing

Employees was destroying his career.  Ms. Townsend suggested Mr. Moore look to Human

Resources for help, because there were "black people" there.

37.     Accordingly, Mr. Moore spoke to Deputy Assistant Secretary Bruce Williamson.

Mr. Moore explained his job prospects were non-existent due to the State Department's refusal

to counter the negative press and rumors surrounding his time in Naples.  Mr. Williamson sent

Mr. Moore back to Ms. Townsend.  Ms. Townsend informed Mr. Moore that any statement

released by the State Department would come with the proviso that it was, in actuality, Mr.

Moore's personal statement and not an official pronouncement by the State Department.

38.     Mr. Moore also spoke with John Robinson, then Director of the Office of Civil

Rights and Chief Diversity Officer, regarding the State Department's unwillingness to publicly

refute the false statements the Low-Performers made to the media.  Mr. Moore spoke with Mr.

Robinson because any prospective nomination to a senior position must be vetted by the Office

of Civil Rights.  Mr. Moore sought Mr. Robinson's support for an official State Department

declaration of his innocence.  Mr. Moore explained in painful detail how the bad press and

internal gossip were affecting his career.  Mr. Robinson, instead of assisting Mr. Moore,

repeatedly encouraged him to leave the State Department for the private sector.  Mr. Robinson

even requested officials in the Bureau of Intelligence and Research ("INR") to counsel Mr.

Moore to leave the Foreign Service.

39.      In late fall of 2015, the Low-Performing Employees continued their attack on Mr.

Moore when Jeffrey Young went to the Office of the Inspector General ("OIG") and accused Mr.

Moore of giving false testimony in Young's EEO proceeding..  Mr. Moore testified in Young's

EEO case that Young was the only Acting Consul General during his tenure in Naples, Italy.

Young alleged this testimony was untrue.  Mr. Moore was compelled to answer questions by

Special Agent Samuel C. Brown of the State Department's OIG about Young's offensive

allegations.  Once again, Mr. Moore said these attacks were racially motivated.

40.      The State Department, always silent regarding Mr. Moore, was a vocal advocate

for Under Secretary Patrick Kennedy, who is Caucasian.  In response to Secretary of State

Hillary Clinton's email scandal, the State Department issued an official statement to the

Washington Post on March 27, 2016.  It stated, "Under Secretary Kennedy maintains that he was

unaware of the email server.  Completely separate from that issue, Under Secretary Kennedy was

aware that at the beginning of her tenure, Secretary Clinton's staff was interested in setting up a

computer at the Department so she could email her family during the work day.  As we have

previously made clear-no such computer was ever set up.  Furthermore, Under Secretary

Kennedy had very little insight into Secretary Clinton's email practices including how frequently

or infrequently the-Secretary Clinton used email."

41.      Mr. Moore alleges upon information and belief that Messrs. Gutman and Kennedy

are not the only Caucasian officials whom the State Department has defended publicly, and Mr.

Moore is not the only African-American official the State Department has refused to defend publicly.

42.     As a result of the coordinated attacks against him and the Department's failure to publicly defend him, Mr. Moore's reputation is ruined.  Upon "googleing" Mr. Moore's name on the internet, one is bombarded by articles repeating the lies of the Low-Performing Employees in Naples.  Mr. Moore's many accomplishments for the State Department are nowhere to be found.

43.     Mr. Moore is currently ranked as an FECOC in the Senior Foreign Service.  Since the coordinated attacks began in 2012, Mr. Moore has not been promoted to the next class of Minister Consul (FEMC) or received any performance pay bonuses.  His career advancement is stymied due to the State Department's inaction and the inherently discriminatory nature of the bidding process.  The bidding process is used for advancement within the State Department.  The process encourages informal and formal communications and relies on "corridor reputation" to make assignment decisions.  Oftentimes, a Bureau will reach out to a candidate before the candidate bids, or Senior Leaders will recommend a candidate to another Senior Leader.  Despite his accomplishments, this has not occurred for Mr. Moore.  As a result, he must network for positions.  However, the State Department foreclosed this career avenue as well.  In order to effectively network, Mr. Moore must explain the negative news about his time in Naples.  He cannot adequately do so, because he was instructed not to discuss cases involving the Low-Performing Employees.  With the State Department refusing to publicly or even internally support him, Mr. Moore cannot lobby for positions which make him competitive for promotions.

44.     Although he was eminently qualified, Mr. Moore received none of the assignments on which he bid during the 2013-2016 bidding process.

45.     The State Department's assignment process promotes discrimination.  The assignment and promotion process is secret and infected by gossip and innuendo.  Candidates are never informed why they are not promoted.  The State Department knows full well that "corridor reputation" and bias is what rules the day on assignment and promotion decisions.

46.     The secret and discriminatory assignment and promotion process is a part of the State Department's overarching diversity problem.  African-Americans are underrepresented in the Foreign Service, and even more so in high-level Foreign Service positions.  In 2013, only 5.48% of Foreign Service Generalists were African-American, while 82.52% were white.  As of June 30, 2017, even fewer African-Americans are Foreign Service Generalists.  Just 5.33% are African-American, while 81.54% are white.  It is no surprise, therefore, that African-Americans fare poorly when it comes to promotion to high-level positions.  In 2015, 146 candidates competed for promotion from Minister Counsel (FEMC) to Career Minister (FECM).  Almost 3% of the candidates were promoted, but less than 1% of them were African-American.  Also in 2015, 238 candidates competed to be promoted from Generalist FEOC to Generalist FEMC.  Over a quarter of the candidates were promoted, but 0% of those promoted were African-American.  Similarly, that year, 366 candidates competed for promotion from Generalist FS-01 to Generalist FEOC, and although over a quarter of the candidates were promoted, none were African-American.  In 2016, 141 FEMC employees competed for promotion to FECM.  No African-Americans were promoted.  That same year, 251 Generalist FEOC employees competed to become FEMC.  While over 24% of candidates were promoted, only 2% were African-American.  The African-American Generalist FS-01 employees vying to become FEOC fared even worse.  Out of 343 candidates, 26.5% were promoted.  None were African-American.

## **PROCEDURAL BACKGROUND**

47.     Mr. Moore contacted an EEO counselor in December of 2016 to address these ongoing discriminatory issues.

48.     Once again, in an attempt to work with the State Department, he engaged in mediation discussions.  Despite being led to believe the State Department wished to find a global solution to all issues, during the mediation, management refused to discuss matters related to Mr. Moore's allegation of breach of the 2013 settlement by failing to publicly exonerate him.  During this mediation, management learned Mr. Moore was alleging bad faith negotiations in the mediation of his 2013 EEO complaint.  However, despite this set back, after two days of mediation an agreement was reached and only a memorialization remained.  While waiting for the memorialization, Mr. Moore sent a letter on May 10, 2016 to the Office of Civil Rights, adding bad faith negotiations to his allegations of breach of the 2013 settlement agreement.  Then, on May 13, 2016, before the agreement was transcribed, the State Department inexplicably backed out of the settlement agreement, likely in retaliation for his claim of bad faith.  This action is unprecedented within the annals of mediation in the State Department.

49.     Mr. Moore filed his formal EEO complaint on May 11, 2016.  Per an agreement arrived during the second day of mediation, he sent a supplement to the complaint on July 15, 2016.  The Report of Investigation ("ROI") was released on February 2, 2017.  On March 3, 2017, Mr. Moore submitted a rebuttal to the ROI and requested a Final Agency Decision.  The State Department made its Final Agency Decision on May 1, 2017.

## COUNT I:
## UNLAWFUL DISCRIMINATION BASED
## ON RACE AND COLOR (HOSTILE WORK
## ENVIRONMENT) IN VIOLATION OF 42 U.S.C. § 2000e

50.     Mr. Moore adopts and incorporates by reference each and every allegation set

forth in the previous paragraphs as if the same were set forth in full in this Count.

51.     Mr. Moore has fulfilled the jurisdictional requirements for filing a Title VII action

of racial discrimination.

52.     The State Department has unlawfully discriminated against Mr. Moore due to his

race.  For the past five years Mr. Moore has endured a hostile work environment due to the State

Department's tolerance of and inherent practice of racial discrimination.  He has been belittled,

rebuffed, rebuked, ignored, and abused by racist Low-Performing Employees and a management

culture infected by racial discrimination.

53.     Mr. Moore has endured relentless, baseless, and racially motivated, EEO and OIG

investigations.  He was accused of a wide-array of nefarious conduct including, engaging in

prostitution, abuse of power, retaliation, violent acts, and even perjury.  He complained about the

racial motivation behind the attacks to State Department management.  He requested the State

Department investigate the abusive use of the EEO and OIG processes by his former

subordinates to discriminate against him, but the State Department refused due to his race.

Consequently, the devastatingly personal, racist attacks on Mr. Moore's very character have and

most likely will continue with no end in sight for Mr. Moore.

54.     The State Department bullied Mr. Moore during his 2013 settlement negotiations,

while he was unrepresented.   Management negotiated in bad faith and withheld essential

17

information from Mr. Moore during the negotiations, crafting an ineffective and imbalanced

settlement due to his race.

55.     Mr. Moore's professional and online reputation is in tatters.  Gossip, innuendo,

and media articles about the Naples scandal have torn it to pieces.  Mr. Moore wakes up every

day knowing his family, friends, and colleagues may encounter the devastating false allegations

on the internet, and within the hallways of the State Department.  The State Department could

put these false rumors to rest, but refuses.

56.     Looking for guidance to continue his well-deserved career trajectory under the

cloud of knowingly false allegations, Mr. Moore was consistently rebuffed, due to his race.

Despite exoneration from DS, the Executive Director of Consular Affairs publicized his doubts

as to Mr. Moore's innocence.  Mr. Moore was told to visit HR because "black people" were

there.  He was scolded not to visit prostitutes.  He was shrouded from public duties at the Air

Force University.  His reviewer received scandalous articles about Mr. Moore.  In response to his

concerns about the Naples scandal, Mr. Moore was repeatedly told to seek employment outside

of the State Department.

57.     Serving his country within the Foreign Service is Mr. Moore's life's work.

However, the State Department's racially motivated decision to ignore the abusive attacks on his

character made it impossible for Mr. Moore to receive promotions.  Without a promotion, Mr.

Moore will soon be forced to retire from the Foreign Service.

58.     The State Department's public support of its white employees such as Under

Secretary Kennedy shows its refusal to support Mr. Moore is based on his race.

59.     As a direct and proximate result, Mr. Moore suffered, and continues to suffer injury from loss of income and benefits of employment, other past and future pecuniary losses. He also suffered and continues to suffer emotional pain, anguish, loss of enjoyment of life, and other nonpecuniary losses and injury.

## COUNT II:
## UNLAWFAL RETALIATION BASED ON PRIOR
## PROTECTED ACTIVITY IN VIOLATION OF 42 U.S.C. § 2000e

60.      Mr. Moore adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full in this Count.

61.     Mr. Moore has fulfilled the jurisdictional requirements for filing a Title VII action of unlawful retaliation.

62.     The State Department has unlawfully retaliated against Mr. Moore for engaging in protected activity in violation of Title VII.

63.     Mr. Moore participated in EEO proceedings as a witness and complainant.  Mr. Moore consistently opposed racial discrimination by stating the EEO and OIG cases instigated by the Low-Performing Employees concerning his actions were motivated by racial animus. Throughout the ordeal, he recounted his protected activity to supervisors, management, the Executive Office for the Bureau of European Affairs, Human Resources and the Office of Civil Rights.

64.     The State Department considers Mr. Moore poisonous due to his role in this protected activity and refuses to investigate the racial motive behind the attacks against Mr. Moore, or support him professionally.

65.     The State Department retaliated against Mr. Moore for his involvement in EEO and OIG activity when it negotiated in bad faith in 2013, creating a useless settlement agreement. It similarly retaliated against Mr. Moore by abandoning the agreement forged during mediation for Mr. Moore's 2016 EEO complaint after Mr. Moore contacted OCR about the bad faith negotiations during his 2013 settlement negotiations.

66.     Management refused to assist Mr. Moore in finding onward assignments due to the false gossip created and promulgated by his involvement in several EEO cases.

67.     Due to the State Department's retaliatory actions, Mr. Moore's career path is frozen.  He has not been promoted or received pay bonuses since before his time in Naples.  He is unable to engage in meaningful settlement discussions with the State Department because its only interest is in punishing Mr. Moore for being the unfortunate recipient of racist attacks.  The State Department's retaliation makes it impossible for Mr. Moore to effectively apply for positions.  Even if Mr. Moore wished to find work outside of the State Department, his online reputation caused by the racist attacks of State Department employees makes finding positions in the private sector unlikely.

68.     As a direct and proximate result of the State Department's retaliation, Mr. Moore suffered, and continues to suffer injury from loss of income and benefits of employment, other past and future pecuniary losses.  He also suffered and continues to suffer emotional pain, anguish, loss of enjoyment of life, and other nonpecuniary losses and injury.

**COUNT III:**
**UNLAWFUL DISCRIMINATION BASED ON RACE**
**AND COLOR IN VIOLATION OF 42 U.S.C. § 2000e**

69.     Mr. Moore adopts and incorporates by reference each and every allegation set

forth in the previous paragraphs as if the same were set forth in full in this Count.

70.     Mr. Moore has fulfilled the jurisdictional requirements for filing a Title VII action

of unlawful retaliation.

71.     The State Department has unlawfully discriminated against Mr. Moore because of

his race by failing to promote him and denying him pay increases.  Mr. Moore has not been

promoted and has been denied pay increases since 2012.

72.     The assignment and promotion process is shrouded in secrecy and indelibly

infected with racial discrimination arising from the primacy of "corridor reputation" in the secret

selection process.  This violates fundamental due process.

73.     Mr. Moore's over 25 years of award winning service and superior leadership

skills more than qualifies him for promotion.  Mr. Moore has received numerous awards for his

tireless efforts on behalf of the State Department.

74.     The State Department has a pattern of failing to hire and promote African-

Americans.  Mr. Moore is a Generalist FEOC and should have been promoted to FEMC long

ago.  He was not, due to his race.  In 2015, none of the African-American Generalist FEOC

candidates were promoted to the next level, FEMC.  The next year, only 2% of employees

promoted from Generalist FEOC to FEMC were African-American.

75.     The State Department protects the reputation of its white employees, ensuring

their success for promotion.  Throughout the turmoil of these events, Mr. Moore implored

21

multiple officials within the State Department to publicize his proven innocence, as evidenced in the DS memorandum.  Although the State Department allowed Ambassador Gutman to defend himself, and rushed to the defense of Under Secretary Kennedy, it remains silent regarding Mr. Moore, because of his race.  In 2013, the State Department declined to release a prepared, and cleared statement exonerating Mr. Moore.  The State Department has declined to defend Mr. Moore's service in Naples, while publicly supporting its white employees.

76.     As a direct and proximate result of the State Department's discrimination, Mr. Moore suffered, and continues to suffer injury from loss of income and benefits of employment, other past and future pecuniary losses.  He also suffered and continues to suffer emotional pain, anguish, loss of enjoyment of life, and other nonpecuniary losses and injury.

## PRAYER FOR RELIEF

WHEREFORE, Donald L. Moore prays for the following relief:

a.   A declaratory judgment that the conduct engaged in by Defendants was a violation of Plaintiff's legal rights;

b.  Back pay with interest, to make Plaintiff whole for the loss he has suffered as a result of the discrimination against him as alleged in this Complaint;

c.  Lost fringe benefits and/or front salary and benefits to the Plaintiff that he would have received but for Defendant's actions;

d.  An award of statutory compensatory damages (pecuniary and non-pecuniary) up to the maximum amount permitted by relevant and applicable law;

e.  An order directing Defendants to pay reasonable attorney's fees and costs of this litigation as provided by 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988(b), D.C. Code § 2-1401 *et seq*. and/or F.R.C.P. 54(d)(1);

f.  An order requiring Defendants to take other appropriate nondiscriminatory measures to overcome the effects of discrimination;

g.  Punitive damages in an amount deemed reasonable according to relevant and applicable law; and,

h.  For any such incidental and other further relief to which Mr. Moore may show himself justly entitled.

## JURY DEMAND

Mr. Moore hereby demands a trial by jury of all issues of fact and law raised by the allegations in this Complaint.

Respectfully submitted,

HANNON LAW GROUP

_____*/s/ J. Michael Hannon*_____
J. Michael Hannon, Bar No. 352526
Karey L. Hart, Bar No. 1030646
333 8th Street, N.E.
Washington, D.C.  20002
(202) 232-1907
(202) 232-3704, Facsimile
jhannon@hannonlawgroup.com
khart@hannonlawgroup.com

*Attorneys for Plaintiff Donald L. Moore*

23