# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONALD L. MOORE,

        *Plaintiff*,

  v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

        *Defendants*.

No. 17-cv-1531 (DLF)

## MEMORANDUM OPINION

Donald L. Moore brings this Title VII action against his employer, the U.S. Department of State, and Secretary of State Michael Pompeo,[1] asserting that they subjected him to a hostile work environment, retaliated against him for protected activity, and discriminated against him on the basis of his race. Before the Court is the defendants' Motion to Dismiss, Dkt. 21. For the reasons that follow, the Court will deny the motion.

## I. BACKGROUND

Donald Moore, an African American male, has worked for the Department of State since 1992. *See* Compl. ¶¶ 1, 8, Dkt. 1.[2] Moore's career at the Department had a promising start. He received several awards for excellence and was promoted into the Senior Foreign Service on his first try. *Id.* ¶ 8. But his career advancement came to an end in 2010 when Moore became

---

[1] Moore originally sued then–Secretary of State Rex Tillerson, but when Michael Pompeo became Secretary of State, he was automatically substituted. *See* Fed. R. Civ. P. 25(d).

[2] The facts here are recited as alleged in the plaintiff's complaint and are assumed true, as they must be in considering a motion to dismiss. *See Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 8 (D.D.C. 2018).

Consul General of the U.S. Consulate in Naples, Italy.  *Id.* ¶ 9.  In Naples, Moore clashed with a group of subordinates engaging in workplace misconduct.  *Id.* ¶ 11.  He counseled the employees individually, but they rejected his leadership and allegedly "embarked on relentless, racially motivated attacks" against him.  *Id.*

The employees began their attacks by filing four Equal Employment Opportunity (EEO) complaints and submitting allegations of misconduct to the Office of Inspector General (OIG). *Id.* ¶ 12.  The employees accused Moore of, among other things, consorting with prostitutes in his official residence.  *Id.*  ¶ 13.  Moore defended himself in the EEO and OIG proceedings and claimed that the employees' allegations were "racially motivated" and designed to cover up their own "poor performance."  *Id.* ¶ 12.

Two of the employees—William and Kerry Howard—then shared "salacious rumors" with U.S. Senator Rand Paul, *id.* ¶ 14, and Congress referred the allegations to the Bureau of Diplomatic Security for investigation, *id.* ¶ 15.  The State Department investigation exonerated Moore, who in turn asked Department leadership for "public support" to clear his name.  *Id.* ¶¶ 15–16.

The Department refused.  *Id.* ¶ 16.  Adding insult to injury, Executive Director of Consular Affairs James Herman stated that the allegations didn't surprise him considering Moore's "corridor reputation."  *Id.*  Herman shared that opinion with several "influential State Department officials" even though he knew that Moore was seeking future assignments and that Moore's reputation would be critical to that process.  *Id.*

Meanwhile, Kerry Howard took the allegations against Moore to the Italian press.  *Id.* ¶ 17.  In Italy, more than 60 articles reported the allegations.  *Id.*  In June 2013, the negative

publicity spread to the United States, where stories about Moore's purported "trysts" with prostitutes appeared online and in the *New York Post*. *Id.* ¶ 17.

Department officials struggled with how to react to the scandalous media stories. They discussed their options with the Bureau of European and Eurasian Affairs and considered "a comprehensive, official response" that would include reporting the results of the Diplomatic Security investigation. *Id.* ¶ 18. Two Department offices and three high-ranking officials approved a press statement announcing that Moore had been cleared of all charges, but ultimately the Department decided not to release it. *Id.* Moore, for his part, could not defend himself publicly because a Department policy prohibited employees from speaking to the press. *Id.* ¶ 19.

With the scandalous rumors unaddressed, Moore sought an "onward assignment" within the Department, but "[n]o mission would touch him." *Id.* ¶ 21. Ultimately, the Department detailed Moore to a "dead-end position" at a university in Alabama operated by the U.S. Air Force. *Id.* The university initially objected to the placement. *Id.* It later accepted Moore but did not let him do "public outreach" or "presentations." *Id.*

In August 2013, before leaving for Alabama, Moore sought a "formal endorsement" from two high-ranking Department officials to "rehabilitate his reputation and career for onward assignments." *Id.* ¶ 22. They refused. *Id.* One of the officials described the Naples controversy as "poisonous;" the other warned Moore "not to procure prostitutes" in Alabama. *Id.*

Undeterred, Moore sought support for another position in the Department's Visa office. *Id.* ¶ 23. He scheduled a meeting with a Department official in August 2013, but the official cancelled without explanation. *Id.* Later, Moore met with two more officials seeking support for

yet another position.  *Id.*  They declined, citing concerns about Moore's "'modeling' and reputation."  *Id.*

In October 2013, Herman—the official who previously called Moore's "corridor reputation" into doubt, *id.* ¶ 16—requested an "assessment" of Moore from Moore's colleagues, *id.* ¶ 24.  The timing of this request was unusual and contrary to Department policy.  *Id.*

That same month, the Department's Office of Civil Rights dismissed the EEO complaint filed by Kerry Howard—the Naples employee who had shared the prostitution allegations with the Italian press.  *Id.* ¶ 25.  A few days after the dismissal, an online article reported that the Department had "Swept Sex Scandals Under the Rug."  *Id.* ¶ 26.

In the fall of 2013, Moore realized he was "stymied" by the Department's failure to remedy the negative impact of the Naples allegations on Moore's reputation and advancement.  *Id.* ¶ 27.  He filed an EEO complaint alleging unlawful discrimination and was "railroaded" into mediation with the Department.  *Id.* ¶¶ 27, 28.  The mediation involved Moore—who was unrepresented by counsel—four "Responding Officials," an "HR Representative," a "Resolving Official," and two "Mediators."  *Id.* ¶ 28.  This "impressive representation" on behalf of the Department was "intimidating" to Moore, but it showed him that "he was being taken seriously."  *Id.*

During the mediation, the Department did not disclose that Kerry Howard had received a "right to sue" letter from the Office of Civil Rights and would likely file a lawsuit in federal court.  *Id.*  The Department also did not explain that such a lawsuit could lead to further negative publicity for Moore, or that it could provide an opportunity for the Department to publicly defend Moore's reputation through litigation.  *Id.*

In November 2013, Moore entered a settlement agreement with the Department. *Id.*; *see also* Defs.' Mot. to Dismiss Ex. 1, Dkt. 21-3 (copy of agreement).[3] Moore agreed to "withdraw and quit for all time any and all claims, demands, actions, causes of action, complaints, or suits against the Department, . . . whether or not known[,] arising, or which might arise, up to and including the date of this Agreement." Defs.' Mot. to Dismiss Ex. 1, ¶ 1. In exchange, the Department agreed to have certain high-level Department officials meet with Moore to discuss his bids for onward assignments, to extend the deadline for Moore's bids, to extend his "Time in Class" by one year, to consider making proposed changes to Moore's 2012 employee evaluation, to provide a positive recommendation for Moore to use in his bids, to provide Moore with technology to facilitate his remote communication with the Department, and to "issue a memorandum to [Moore] summarizing the results of the Bureau of Diplomatic Security's investigation" of the matters in Naples. *Id.* ¶ 9.[4]

After executing the agreement, the Department chose not to make any changes to Moore's 2012 employee evaluation. *Id.* ¶ 30. And it gave Moore mixed messages on what he could do with the memorandum summarizing the Diplomatic Security investigation. *Id.* One

---

[3] The Court may consider the defendants' copy of the settlement agreement because Moore does not contest its authenticity and because he incorporated the agreement by reference in his complaint. *See*, *e.g.*, *Slovinec v. Georgetown Univ.*, 268 F. Supp. 3d 55, 59 (D.D.C. 2017), *aff'd*, No. 17-7122, 2018 WL 1052650 (D.C. Cir. Jan. 26, 2018) (per curiam).

[4] The agreement further provided that if Moore

> believes that the Department has failed to comply with the terms of this Agreement, [Moore] shall notify the Director, Office of Civil Rights . . . in writing of the alleged noncompliance within 30 days when [Moore] knew or should have known of the alleged noncompliance[.] . . . [I]f material noncompliance is established, [Moore] may request that the terms of this Agreement be specifically implemented or, alternatively, that [Moore's EEO] complaint be reinstated for further processing . . . and [Moore] returned to *status quo ante*.

Defs.' Mot. to Dismiss Ex. 1, ¶ 1.

office told Moore he could use it however he pleased once it was in his possession; another told him he could release it publicly only if he made clear that its contents reflected Moore's own views and not those of the Department. *Id.*

In January 2014, Kerry Howard filed a federal lawsuit that repeated her allegations against Moore. *Id.* ¶ 32. Two U.S. news articles—one in the *New York Post* and one in *Newsweek*—reported on the allegations. *Id.* ¶ 33. The Department subsequently settled Kerry Howard's lawsuit. *Id.* ¶ 35. When Moore found out about the settlement, he requested that the Department issue a press release stating that Moore had been cleared of the prostitution allegations. *Id.* ¶ 36. A member of the Executive Office for the Bureau of European Affairs refused, and when Moore told her that the allegations had been destroying his reputation within the Department for years, she advised him to consult with Human Resources because "there were 'black people' there." *Id.* Later, the same employee made clear to Moore that any press release concerning the allegations would have to include a disclaimer that the release reflected Moore's views and not the Department's. *Id.* ¶ 37.

Dissatisfied, Moore spoke with John Robinson, the Director of the Office of Civil Rights and Chief Diversity Officer of the Department. *Id.* ¶ 38. Moore explained the negative impact of the Department's persistent refusal to clear his name, and he requested Robinson's support for a promotion. *Id.* Robinson responded by suggesting that Moore consider leaving the Department for the private sector. *Id.*

In the fall of 2015, Jeffrey Young—one of the employees who clashed with Moore in Naples—complained to the Office of Inspector General that Moore had perjured himself in Young's EEO proceeding. *Id.* ¶ 39. Moore responded to the perjury allegation and expressed his view that it was racially motivated. *Id.*

Since 2012, Moore has received no promotions or performance-based bonuses. *Id.* ¶ 43. His advancement has allegedly been "stymied" by the Department's failure to publicly clear him of the prostitution allegations and by the "inherently discriminatory nature of the bidding process" used for advancement within the Department. *Id.* Because the bidding process relies heavily on reputation, recommendations, and networking, it has been effectively foreclosed to Moore, who must try to explain the Naples rumors without violating the confidentiality of other employees' EEO proceedings and without the benefit of institutional support or a curative press release from the Department. *Id.* From 2013 to 2016, Moore received none of the assignments for which he bid, in part because of his inability to effectively address the Naples rumors. *Id.*

Moore alleges that his own experience reflects an "overarching diversity problem" at the Department. *Id.* ¶ 46. He provides several statistics suggesting that African Americans are underrepresented within the Department and that they "fare poorly when it comes to promotion to high-level positions." *Id.*

Moore also alleges that the Department treated Caucasian employees embroiled in controversy more favorably than it treated him. *Id.* ¶¶ 20, 40. Moore provides several examples: In June 2013, Ambassador Howard Gutman, a Caucasian male, was accused of soliciting prostitutes. *Id*. ¶ 20. Unlike Moore, however, Gutman was given permission to publicly deny the allegations. *Id.* In 2015, Under Secretary Patrick Kennedy—also Caucasian— was accused of participating in "Secretary of State Hillary Clinton's email scandal," and the Department stated publicly that Kennedy denied knowledge of Secretary Clinton's private email

server and that he "had very little insight into [her] email practices." *Id.* ¶ 40.[5] Moore also "alleges upon information and belief" that the Department has defended other unnamed Caucasian officials publicly and has refused to do the same for other unnamed African-American officials. *Id.* ¶ 41.

Moore pursued his claims administratively along two parallel tracks. First, he contacted the Office of Civil Rights on February 1, 2016, claiming that the Department had breached its 2013 settlement agreement with Moore. *Id.* ¶ 30. On May 10, 2016, he added a claim that the Department had acted in bad faith when it negotiated the agreement back in 2013. *Id.* ¶¶ 30, 48. The Office of Civil Rights rejected both claims, and Moore appealed the Office's decision to the Equal Employment Opportunity Commission (EEOC). *See* Defs.' Mot. to Dismiss Ex. 2 at 3, Dkt. 21-4. On November 8, 2016, EEOC issued a final decision finding that the Department had not breached the settlement agreement and had not acted in bad faith. *Id.* at 4–5, 7–8. EEOC notified Moore that he could request reconsideration of the decision within 30 days or file a civil action within 90 days. *Id.* at 5–6. Moore did neither.

Separately from these Office of Civil Rights and EEOC proceedings, Moore contacted an EEO counselor at the Department in December 2015[6] to address what he viewed as ongoing employment discrimination. *Id.* ¶ 47. Moore agreed to mediation, which he hoped would resolve all issues between him and the Department, including the breach-of-settlement

---

[5] Moore also alleges in his opposition brief that William Howard, a Caucasian male and one of the low-performing employees who was accused of sexual harassment, was promoted even though the Department's investigation concluded that Howard's accusations against Moore were false. Pl.'s Opp'n at 26, Dkt. 23.

[6] The complaint alleges that Moore contacted the counselor in December *2016*, but that must be a typo. The contact began a process of mediation that concluded in May 2016. *See* Compl. ¶¶ 47–48. And the Department's final decision states that Moore "contacted an EEO Counselor on December 8, 2015." *See* Defs.' Mot. to Dismiss Ex. 5 at 7, Dkt. 21-7 (ECF pagination).

allegations then pending before the Office of Civil Rights. *Id.* ¶ 48. The Department refused to discuss the breach allegations in mediation, but the parties were still able to reach an agreement, and "only a memorialization remained." *Id.* Before the memorialization occurred, however, Moore contacted the Office of Civil Rights to add "bad faith" to his pending breach-of-settlement allegation. *Id.* Three days after that, on May 13, 2016, the Department abandoned the tentative agreement it had reached with Moore in mediation—allegedly as retaliation for Moore alleging "bad faith" in the parallel Office of Civil Rights proceeding. *Id.*

Moore filed a formal EEO complaint on May 11, 2016 and supplemented the complaint on July 15, 2016. *Id.* ¶ 49. The Department wrote to Moore on July 29, 2016 to inform him that it had accepted the following allegation for investigation:

> Because of your race (African-American) and as acts of reprisal for prior protected activity and opposing discriminatory policies or practices, you were discriminated against when since 2013, you have been subjected to an ongoing hostile work environment, characterized by, but not limited to intimidation, management failing to take corrective action in response to concerns you have raised, and stymied advancement opportunities.

Defs.' Mot. to Dismiss Ex. 4 at 1, Dkt. 21-6.

The letter further explained that Moore would "have the opportunity to discuss specific examples of the hostile work environment with the EEO investigator," *id.* at 1, and that these examples would "be investigated within the penumbra of the hostile work environment allegation," *id.* at 2. The letter also informed Moore that he was required to notify the Department in writing within 5 days if he objected to the framing of the issue accepted for investigation. *Id.*

The Department issued a final decision on May 1, 2017 denying Moore's discriminatory and retaliatory hostile work environment claim. *See* Defs.' Mot. to Dismiss Ex. 5 at 2, 29–41. The Department assumed without deciding that Moore established discrimination and retaliation

but concluded that he failed to show that the Department's "actions amounted to a hostile work environment."[7] *Id.* at 41.

Moore filed this suit on July 28, 2017. Count I alleges "unlawful discrimination based on race and color (hostile work environment)," Compl. at 17; count II alleges "unlawful retaliation based on prior protected activity," *id.* at 19; and count III alleges "unlawful discrimination based on race," *id.* at 21.

The defendants moved to dismiss, arguing that the bulk of Moore's allegations are barred by settlement agreement, unexhausted, and untimely, and that the remaining allegations are insufficient to state a claim on the merits. For the reasons that follow, the Court agrees.

## II. LEGAL STANDARD

A motion to dismiss Title VII claims—including for failure to exhaust administrative remedies—is properly analyzed under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Jones v. Bush*, 160 F. Supp. 3d 325, 337 (D.D.C. 2016), *aff'd*, No. 16-5103, 2017 WL 2332595 (D.C. Cir. Feb. 21, 2017) (per curiam); *Mount v. Johnson*, 36 F. Supp. 3d 74, 80 (D.D.C. 2014). Rule 12(b)(6) allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility

---

[7] It also concluded that Moore failed to prove that the legitimate, non-discriminatory reasons offered by the Department for its actions were pretextual. Defs.' Mot. to Dismiss Ex. 5 at 41.

that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 557 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Relevant here, the Court may consider Moore's EEO documents. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (considering "the pleadings and undisputed documents in the record" while reaching the merits on a motion to dismiss); *Vasser v. McDonald*, 228 F. Supp. 3d 1, 11 (D.D.C. 2016) (taking judicial notice of informal and formal administrative complaints on a motion to dismiss); *Williams v. Chu*, 641 F. Supp. 2d 31, 35

(D.D.C. 2009) ("A plaintiff's EEOC charge and the agency's determination are both public records, of which this Court may take judicial notice." (quotation marks and alteration omitted)). Finally, a Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III.  ANALYSIS

### A.    Count I: Hostile Work Environment

#### 1.    Allegations Before November 26, 2013

The defendants argue that the 2013 settlement agreement bars Moore from asserting any allegations that predate November 26, 2013.  *See* Defs.' Mot. to Dismiss 1, 3–4, 9–11.  The Court agrees.

Courts have repeatedly held that a valid settlement agreement bars a plaintiff from asserting facts covered by the agreement in a subsequent hostile environment action.  *See Perry v. Gotbaum*, 766 F. Supp. 2d 151, 166 (D.D.C. 2011) ("[A]ny claims relating to conduct prior to [the date specified in the settlement agreement] have been settled and released by [the plaintiff], and the Court may not consider such conduct as a basis for [the plaintiff's] hostile work environment claim."); *Johnson v. Ashcroft*, No. 02-1745, 2005 WL 2064095, at *4 (D.D.C. Aug. 25, 2005) (pre-settlement allegations could not be considered in subsequent hostile environment suit even though the suit "involve[d] a different legal claim" because the "plain language" of the settlement agreement "release[d] the defendant from liability based on any claim or cause of action that could have been asserted during the mediation process"); *Miller v. United States*, 603 F. Supp. 1244, 1251 (D.D.C. 1985) (refusing to consider pre-settlement allegations even on a continuing violation theory because the settlement agreement "contain[e]d no such limitation"); *see also Hopkins v. Bd. of Educ. of City of Chicago*, 73 F. Supp. 3d 974, 984 (N.D. Ill. 2014)

("By virtue of the settlement agreement, [the plaintiff] effectively agreed to carve out conduct predating [her EEOC complaint] from any future claim she might assert.").

The settlement agreement here bars Moore from asserting any claims against the Department or its officials "whether or not known arising, or which might arise, up to and including the date of [the] Agreement." Defs.' Mot. to Dismiss Ex. 1, ¶ 1. That language clearly forecloses a hostile work environment claim premised on events before November 26, 2013, when the agreement was executed, *see id.* ¶ 11.

Moore resists this conclusion because, in his view, the settlement agreement is invalid. *See* Pl.'s Opp'n at 14–16. There is no question that he entered the agreement, *see* Compl. ¶ 28, and subsequently sought to enforce it against the Department, *see id.* ¶¶ 30, 48. Nevertheless, Moore argues that the agreement is legally invalid because it lacked "substantial consideration" and because the Department "negotiated in bad faith." Pl.'s Opp'n at 15.

Moore cites no authority to support this legal conclusion, which is alleged nowhere in Moore's complaint and would enjoy no deference even if it were. *See Iqbal*, 556 U.S. at 678. A settlement agreement "between one private party and a federal agency . . .—like any contract with the federal government—is governed by federal common law." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 173 (D.D.C. 2007), *aff'd*, No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008) (per curiam). When fashioning the federal common law of Title VII settlement contracts, the D.C. Circuit looks to the Second Restatement of Contracts because its principles "represent the prevailing view among the states and are consistent with the remedial policies of Title VII." *Bowden*, 106 F.3d at 439 (internal quotation marks and citation omitted). Applying these principles, both of Moore's arguments for invalidity fail.

As for his first argument—that the agreement lacked "substantial consideration"—courts ordinarily "do not inquire into the adequacy of consideration," especially "when one or both of the values exchanged are uncertain or difficult to measure." Restatement (Second) of Contracts § 79 cmt. c. (1981).[8] Here, Moore agreed to withdraw all claims against the Department; in exchange, the Department agreed to take a number of specific actions to facilitate Moore's career advancement within the Department. *See* Defs.' Mot. to Dismiss Ex. 1 ¶¶ 1, 9. This exchange satisfies the requirement of a bargained-for benefit or detriment, and the Court will not inquire further into the relative value each party received.

Moore's second argument—that the Department negotiated in bad faith—is equally unavailing. The Second Restatement does not recognize bad faith as an independent basis for invalidity; rather, "[p]articular forms of bad faith in bargaining are the subjects of rules . . . as to invalidating causes such as fraud and duress." Restatement (Second) of Contracts § 205 cmt. c. Moore invokes none of these specific invalidation rules. He argues only that the agreement is invalid because of three facts: (1) the Department brought five representatives to the mediation while Moore was unrepresented; (2) the Department refused to let Moore release the memorandum summarizing the Diplomatic Security investigation without a disclaimer that its contents reflected Moore's own views rather than the Department's; and (3) the Department failed to disclose that Kerry Howard had been issued a "right to sue letter" by the Office of Civil Rights. *See* Pl.'s Opp'n at 15–16 (citing Compl. ¶¶ 28, 30, 54).

---

[8] *See also* Restatement (First) of Contracts § 81 cmt. a. (1932) ("[W]hatever consideration a promisor assents to as the price of his promise is legally sufficient consideration."); 3 Williston on Contracts § 7:21 (4th ed.) ("[S]o long as the requirement of a bargained-for benefit or detriment is satisfied, the fact that the relative value or worth of the exchange is unequal is irrelevant so that anything which fulfills the requirement of consideration will support a promise, regardless of the comparative value of the consideration and of the thing promised. The rule is almost as old as the doctrine of consideration itself." (footnotes omitted)).

These facts do not establish invalidity under any of the potentially applicable invalidation doctrines—namely, unconscionability, duress, or misrepresentation. "A party attacking the validity of a settlement agreement bears a properly heavy burden." *Kent v. Dep't of the Air Force*, 524 F. App'x 614, 616 (Fed. Cir. 2013) (internal quotation marks omitted and alteration adopted). To establish unconscionability, Moore would have to allege "elements of deception or compulsion" or that he "had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms." Restatement (Second) of Contracts § 208 cmt. d. To establish duress, he would have to allege that the Department committed "coercive acts." *Kent*, 524 F. App'x at 616. And to establish misrepresentation through non-disclosure, he would have to allege that the Department knew or "ha[d] reason to know" that the undisclosed fact would "influence [Moore] in determining his course of action." Restatement (Second) of Contracts § 161 cmt. b.

Moore's trio of "bad faith" allegations falls short of these standards. First, although Moore was unrepresented during mediation, he does not allege that he was in any way prevented from retaining counsel. In fact, he expressly "agree[d] and acknowledge[d]" that he had "been afforded the opportunity to consult with legal counsel" before signing the settlement agreement. Defs.' Mot. to Dismiss Ex. 1, ¶ 4. Further, the presence of multiple Department officials during the mediation did not plausibly amount to coercion or otherwise render the resulting agreement involuntary. Indeed, Moore admits that the officials' presence, while intimidating, assured him that his complaints were being "taken seriously." Compl. ¶ 28.

Second, although Moore may have been disappointed that he could not use the memorandum summarizing the Diplomatic Security investigation to publicly clear his name, an agreement is not unenforceable "merely because the parties to it are unequal in bargaining

position, nor even because the inequality results in an allocation of risks to the weaker party." Restatement (Second) of Contracts § 208 cmt. d. The agreement bound the Department to issue the memorandum *to Moore*—not to the public. *See* Defs.' Mot. to Dismiss Ex. 1, ¶ 9. By failing to bargain for a commitment by the Department to publicly exonerate him or to allow him to speak freely with the media, Moore assumed the risk that the memorandum would not clear his name as he hoped. To the extent Moore disagrees and believes the Department breached its obligations under the agreement, the agreement itself provides a remedy: Moore can allege non-compliance before the Office of Civil Rights and, if he prevails, return to the status quo and reinstate his 2013 EEO claim. *See id.* ¶ 1. Moore started that process, lost, and abandoned his complaint by choosing not to appeal or request reconsideration of the Office's decision. *See* Defs.' Mot. to Dismiss Ex. 2, at 5–6. He cannot resurrect that complaint now by repackaging it as a "bad faith" defense to the agreement's validity.

Finally, although the Department did not disclose that Kerry Howard had received a right-to-sue letter from EEOC, that letter was the natural consequence of Title VII's enforcement procedures and simply reflected the fact that EEOC had completed its investigation. *See* 42 U.S.C. § 2000e-5(f)(1); *see also* 29 C.F.R. § 1601.19(a). An ordinary person would regard the issuance of a right-to-sue letter—which itself has no bearing on the merits of the underlying employment discrimination claim—as unimportant, and the Department had no reason to expect Moore to think otherwise. *See* Restatement (Second) of Contracts § 161 cmt. b (a party "need not disclose facts that the ordinary person would regard as unimportant unless he knows of some peculiarity of the other person that is likely to lead him to attach importance to them"). Moore does not allege that the Department knew or believed that Kerry Howard would file a federal lawsuit or that any such suit would be meritorious. *See* Compl. ¶ 28. Nor does he allege that the

Department expected or planned to settle Kerry Howard's claim. *See id.* Rather, Moore faults the Department for failing to "suggest[]" that a potential lawsuit could create a potential opportunity for the Department to defend him publicly. *Id.* The Department's failure to consider and share this speculative possibility, however, cannot plausibly be considered an element of deception or the omission of a material fact.

In short, Moore has not established any legal basis for invalidating the settlement agreement. The Court will therefore "carve out" any allegations before November 26, 2013 from Moore's hostile environment claim and consider them "only as background information and only to the extent necessary to understand [his] claims." *Hopkins*, 73 F. Supp. 3d at 984.

> 2.  Merits

A hostile work environment exists where a plaintiff's employer subjects him to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In assessing whether a hostile work environment exists, courts "look[] to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.*

Stripped of the pre-settlement allegations, Moore's hostile work environment claim consists of:

- Moore's failure to receive any promotions or performance-based bonuses from November 26, 2013 through 2016. Compl. ¶ 43.

- Young's 2015 Office of Inspector General complaint accusing Moore of perjury. *Id.* ¶ 39.

- Kerry Howard's federal lawsuit and the Department's decision to settle it. *Id.* ¶ 35.

- The Department's refusal to allow Moore to release the memorandum summarizing the Diplomatic Security investigation without stating that it expressed Moore's personal views and not the official views of the Department. *Id.* ¶ 37.

- The Department's failure to revise Moore's 2012 employee evaluation. *Id.* ¶ 30.

- The Department's decision to abandon the tentative settlement agreement it had reached with Moore during mediation in 2016. *Id.* ¶ 48.

- A Department employee's suggestion that Moore consult with HR because "there were 'black people' there." *Id.* ¶ 36.

- Robinson's suggestion that Moore seek employment in the private sector. *Id.* ¶ 38.

These allegations do not establish "severe or pervasive" harassment. First, the allegations are relatively infrequent and spread out over at least two years and across multiple offices within the Department. *See Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing hostile work environment claim in part because "the alleged events [we]re temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness").

Second, the allegations largely concern Moore's prospects for advancement, as opposed to verbal or physical abuse in his actual work environment. "[C]ourts have been hesitant to find a claim for hostile work environment when a complaint contains no allegations of discriminatory or retaliatory intimidation, ridicule, or insult in the plaintiff's day-to-day work environment and relies instead on incidents of allegedly discriminatory non-promotions and other performance-based actions." *Outlaw v. Johnson*, 49 F. Supp. 3d 88, 91 (D.D.C. 2014) (internal quotation marks omitted and alteration adopted). *But see Behrens v. Tillerson*, 264 F. Supp. 3d 273, 280 (D.D.C. 2017) (allowing hostile work environment claim to proceed based largely on performance-related personnel decisions). For example, in *Laughlin v. Holder*, the plaintiff alleged that a "reassignment" had "hurt her reputation and undermined her leadership," 923 F.

Supp. 2d 204, 220 (D.D.C. 2013), and that she had remained in the same role "for more than

seven years while nearly all of [her] peers [we]re promoted," *id.* at 221. But despite the

plaintiff's claim that this career stagnation was "objectively and subjectively humiliating," the

court "simply d[id] not find that the non-promotions and other performance-based actions

alleged r[ose] to the level of an actionable hostile work environment." *Id.* Similarly, in

*Nurriddin v. Bolden*, the court dismissed a hostile environment claim where the employer

allegedly

> passed [the plaintiff] over for performance awards, lowered his performance
> evaluations, unfairly reprimanded and criticized him, made disparaging remarks
> about his EEO complaints, closely scrutinized his work, refused him a window
> cubicle, removed some of his duties, . . . denied his requests to travel or otherwise
> failed to provide support for his work with staffing and funding[, and] opposed his
> career advancement in more direct ways, including the denial of a noncompetitive
> promotion, denial of a within-grade increase, and opposition to his transfer to
> another office or detail assignment.

674 F. Supp. 2d at 93–94. The Court reasoned that the disparaging remarks, diminished

responsibility, negative evaluations, and close scrutiny were not "sufficiently intimidating or

offensive in an ordinary workplace," and it rejected the plaintiff's attempt to combine those

events with "nonpromotions, denial of leave, and termination" to establish a hostile work

environment claim. *Id.* at 94. So too here, Moore's various performance- and promotion-related

allegations were not intimidating or offensive enough to be considered harassment.

Third, the allegations by Young and Kerry Howard were made outside the workplace in

administrative proceedings and public court filings and do not demonstrate harassment within

Moore's actual work environment. At most, Moore accuses the Department of engaging in

passive harassment, by failing to take affirmative steps to rebut those employees' allegations.

But assuming silence can ever constitute actionable harassment—a doubtful proposition—the

Department's decision not to comment on the Naples allegations was squarely addressed by the

2013 settlement agreement and cannot form the basis for a subsequent hostile work environment claim. *See Miller*, 603 F. Supp. at 1251. Further, the Department was limited in its ability to prevent or interfere with its employees' administrative and federal court proceedings, which are themselves protected by Title VII. *See* 42 U.S.C. § 2000e-3(a); *Rochon v. Gonzales*, 438 F.3d 1211, 1215–16 (D.C. Cir. 2006) (explaining that Title VII's substantive retaliation provisions apply to suits against the federal government); *cf. Perry*, 766 F. Supp. 2d at 168–69 (employer entitled to summary judgment where hostile work environment claim was premised on its "failure to stop [statutorily protected] conduct").

Although Moore does allege a single offensive and racial remark by a high-level Department employee, *see* Compl. ¶ 36, generally the "mere utterance of an epithet which engenders offensive feelings in a employee does not sufficiently affect the conditions of employment to implicate Title VII," *Harris*, 510 U.S. at 21 (internal quotation marks omitted and alteration adopted). The D.C. Circuit has suggested that the use of a single "deeply offensive" and "unambiguously racial" epithet might be "sufficient to establish a hostile work environment," *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam) (internal quotation marks omitted), but the isolated comment here—while racially charged and insulting to Moore—was not so deeply and unambiguously offensive as to create a hostile work environment, even in combination with Moore's various other allegations.

*Wise v. Ferrero*, on which Moore relies, is consistent with this conclusion. 842 F. Supp. 2d 120 (D.D.C. 2012). There, a supervisor used the one uniquely offensive racial epithet that the D.C. Circuit has suggested can create a hostile environment by itself. *See id.* at 121; *Ayissi-Etoh*, 712 F.3d at 577. In addition, the plaintiff received "threats of discipline," was "singled out and excluded from trainings and award ceremonies," and was "denied promotions." *Wise*, 842 F.

Supp. 2d at 126. The court held that these allegations "cleare[ed] the Motion-to-Dismiss hurdle, if not by much." *Id.* at 127. But if *Wise* presented a borderline case, then Moore's allegations clearly fall short, as they lack the key elements of insult, ridicule, and exclusion that pushed *Wise* over the edge. *See id.* at 126–27.

Upon reviewing the totality of the Department's alleged discriminatory conduct and its frequency, severity, offensiveness, and impact on Moore's work performance, the Court concludes that Moore has not alleged a hostile work environment. Moore's various disappointments and conflicts within the Department do not establish that he was subjected to "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive" to "create an abusive working environment." *Baloch*, 550 F.3d at 1201 (internal quotation marks omitted). The Court will therefore dismiss count I.[9]

### B.  Count II: Retaliation

There is some confusion over whether count II raises a claim of retaliation based on discrete acts or a retaliatory hostile work environment. *Compare* Defs.' Mot. to Dismiss at 7–8 (treating count II as a discrete retaliation claim), *with* Pl.'s Opp'n at 23–25 (treating count II as a retaliatory hostile work environment claim). Although Moore insists in his opposition brief that the "Department's retaliatory actions . . . are building blocks of a hostile work environment, not discrete acts," Pl.'s Opp'n at 23, and that his "allegations are not discrete acts of discrimination,"

---

[9] Although the Court does not consider Moore's pre-settlement allegations, it would reach the same conclusion even if it did. The Naples employees' original accusations were made outside the workplace in administrative proceedings, to a U.S. senator, and in the media; the Department's role in the scandal was passive and impacted Moore's promotion and advancement as opposed to his actual workplace environment; Moore's detail to a "dead-end position" was a performance-related personnel decision; and the handful of offensive comments made by employees about Moore's reputation and the prostitution rumors were infrequent and scattered across different units within the Department. Moore's complaint therefore does not allege severe or pervasive harassment even when analyzed in its entirety.

*id.* at 24, that theory strays significantly from his complaint. The only mention of a hostile work environment in his complaint appears in count I, both in the heading, Compl. at 17, and in a paragraph alleging a hostile work environment due to "racial discrimination," *id.* ¶ 52. Although count II "adopts and incorporates by reference" every other allegation in the complaint, *id.* ¶ 60, it does not mention a hostile work environment in the heading; nor does it allege that such an environment was imposed on account of Moore's participation in protected activity, *see id.* at 19–20.

Ultimately, the difference is immaterial. If count II does advance a retaliatory hostile work environment claim, then it fails to allege severe or pervasive harassment for the reasons described above. *See supra* III.A. If, on the other hand, it advances a discrete retaliation claim, then it fails to allege an adverse employment action within the relevant filing period, for the reasons that follow.

"Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court." *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (internal quotation marks omitted and alterations adopted); *see also* 42 U.S.C. § 2000e-16(c). The exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision," *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks omitted and alteration adopted), and it "ensure[s] that the federal courts are burdened only when reasonably necessary," *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985). In the Title VII context, failure to exhaust is an affirmative defense, and thus "the defendant bears the burden of pleading and proving it." *Bowden*, 106 F.3d at 437; *see also Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578

(D.C. Cir. 1998) ("[A]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint.").

When the employee alleges that he or she was the victim of a "discrete retaliatory or discriminatory act," the timeliness inquiry focuses on that particular act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002); *see also Achagzai*, 170 F. Supp. 3d at 175. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113.

"Under Title VII, employees who believe they have been discriminated against must first consult an Equal Employment Opportunity (EEO) Counselor within 45 days of the alleged discriminatory acts." *In re James*, 444 F.3d 643, 644 (D.C. Cir. 2006); *see* 29 C.F.R. § 1614.105(a)(1). Moore first contacted the EEO Counselor on December 8, 2015. *See* Defs.' Mot. to Dismiss Ex. 5 at 7. Counting back forty-five days from that date, Moore timely consulted the EEO Counselor regarding only discriminatory or retaliatory acts that occurred on or after October 24, 2015.

That leaves Moore with two possible discrete acts of retaliation: the perjury accusation Young submitted to the Office of the Inspector General "[i]n late fall of 2015," Compl. ¶ 39, and

the Department's decision in 2016 to abandon a tentative settlement agreement with Moore after he contacted the Office of Civil Rights about the Department's alleged bad faith, *id.* ¶ 65.[10]

Neither allegation suffices. To a state a claim for retaliation under Title VII, a complaint must "plausibly establish" that "the employee suffered a materially adverse action by the employee's employer." *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013). Young's OIG complaint does not qualify because "the request for an investigation by an independent body (as opposed to the disciplinary action that may follow) does not constitute an actionable adverse employment action," and Moore does not allege any disciplinary or other employment action resulting from the investigation. *Ware v. Billington*, 344 F. Supp. 2d 63, 76 (D.D.C. 2004); *see*

---

[10] Although the Complaint generally alleges that Moore "received none of the assignments on which he bid during the 2013-2016 bidding process," Compl. ¶ 44, it does not allege that he was denied any particular assignment or promotion during the 45-day filing period. *See Leiterman v. Johnson*, 60 F. Supp. 3d 166, 187 (D.D.C. 2014) (non-promotion treated as a "discrete employment action" for exhaustion purposes, and "the mere allegation that Plaintiff continued in his position" during the 45-day filing window "without the promotion he believed was due [could not] save Plaintiff's claim"). Nor did Moore administratively exhaust any discrete non-promotions or bid rejections. *See* Pl.'s Opp'n Ex. 1 at 11, Dkt. 23-1 (ECF pagination) (asserting only that "promotions are withheld," without specifying which positions or when); *see also Sierra v. Hayden*, 254 F. Supp. 3d 230, 243–44 (D.D.C. 2017) (plaintiff "had an obligation to file administrative complaints within the time required under [agency] regulations for each alleged non-promotion, because each instance of non-promotion constituted a discrete discriminatory action" (internal quotation marks omitted)); *Krishnan v. Foxx*, 177 F. Supp. 3d 496, 504 (D.D.C. 2016) (each "unsuccessful application[] for promotion" was "a discrete event that required a timely EEO complaint.").

*also King v. Holder*, 77 F. Supp. 3d 146, 151 (D.D.C. 2015) (applying this principle to a retaliation claim premised on the initiation of an Office of Inspector General investigation).[11]

The Department's abandonment of the 2016 settlement agreement also does not qualify as a materially adverse action. Even if the tentative, unmemorialized agreement were binding, *but see* 29 C.F.R. § 1614.603 ("Any settlement reached" between an agency and a discrimination claimant "shall be in writing and signed by both parties. . . ."), an employer's breach of a settlement agreement for discriminatory or retaliatory reasons "is not enforceable under Title VII as an adverse personnel action because it is appropriately addressed under principles of contract law," *Kilpatrick v. Paige*, 193 F. Supp. 2d 145, 154 (D.D.C. 2002).

Because Moore alleges neither severe or pervasive harassment nor a discrete and materially adverse action within the 45-day filing window, the Court will dismiss count II.

## C.   Count III: Discrimination

Count III fails for the same reason as count II. The only discrete acts alleged in the relevant filing window are Young's perjury complaint and the Department's abandonment of the tentative settlement agreement in 2016—neither of which qualifies as an adverse employment action. *See Baloch*, 550 F.3d at 1196 (an "adverse employment action" is an "essential element[]" of a Title VII discrimination claim).

---

[11] Further, it is not clear that the Department could have prevented or interfered with Young's participation in the Office of Inspector General proceeding without running afoul of Title VII's antiretaliation provisions. *See Paulk v. Architect of the Capitol*, 79 F. Supp. 3d 82, 90–91 (D.D.C. 2015) (assuming that the plaintiff's "participation" in an "OIG safety investigation" constituted protected activity for purposes of Title VII suit), *aff'd in part*, No. 15-5036, 2015 WL 5231062 (D.C. Cir. July 1, 2015), *dismissed*, No. 15-5036, 2015 WL 6153697 (D.C. Cir. Oct. 7, 2015); *cf. Perry*, 766 F. Supp. 2d at 166 (employer entitled to summary judgment where Title VII claim was based on the employer's failure to stop its employees' protected activity).

Count III also fails for an independent reason: Moore never exhausted a claim based on discrete acts of discrimination. Rather, his administrative complaint and supplement alleged only that he had "been the victim of continuing discrimination . . . *in the form of a hostile work environment*." Pl.'s Opp'n Ex. 1 at 9 (emphasis added). Based on the hostile work environment theory advanced in Moore's administrative complaint, the Department notified Moore by letter that it had accepted a single claim of a retaliatory and discriminatory "hostile work environment" for investigation. Defs.' Mot. to Dismiss Ex. 4 at 1; *see also id.* at 1–2 (explaining that Moore would have an "opportunity to discuss specific examples of the hostile work environment" and that these examples would "be investigated within the penumbra of the hostile work environment allegation"). Moore was given an opportunity to object to the agency's framing and "propose an alternative formulation" if he "believe[d] the issues ha[d] not been properly articulated," *id.* at 2, but he did not do so.

"A Title VII lawsuit following the EEOC charge is limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Park*, 71 F.3d at 907 (internal quotation marks omitted). Because a hostile work environment claim and a discrete discrimination claim are "different in kind," *Morgan*, 536 U.S. at 115, exhausting one does not exhaust the other. Moreover, "courts have generally held that failure to respond to the [agency's] framing of the issue supports a finding that a plaintiff has failed to exhaust his administrative remedies with respect to those claims not approved by the EEO." *McKeithan v. Boarman*, 803 F. Supp. 2d 63, 68 (D.D.C. 2011) (internal quotation marks omitted) (collecting cases), *aff'd in part*, No. 11-5247, 2012 WL 1450565 (D.C. Cir. Apr. 12, 2012) (per curiam), *aff'd sub nom. McKeithan v. Vance-Cooks*, 498 F. App'x 47 (D.C. Cir. 2013) (per curiam). "[W]here an agency reasonably fails to identify for investigation a claim indirectly

asserted in a plaintiff's administrative charge, and where the plaintiff does not timely object to this omission before the agency, the plaintiff cannot show that he has exhausted administrative remedies as to this claim." *Dick v. Holder*, 80 F. Supp. 3d 103, 114–15 (D.D.C. 2015).

Here, the Department acted reasonably in omitting a discrete discrimination claim from its investigation. Moore's complaint focused exclusively on a hostile work environment theory, *see* Pl.'s Opp'n Ex. 2 at 9–10, and Moore "made no attempt to augment the accepted allegation or amend his [EEO] complaint prior to the conclusion of the investigation," *Green v. Small,* No. CIV.A. 05–1055, 2006 WL 148740, at *6 (D.D.C. Jan. 19, 2006) (internal quotation marks omitted). Because Moore did not exhaust a discrete discrimination claim, he cannot advance one for the first time here.[12]

The Court will dismiss count III for failure to state a claim on the merits and for failure to exhaust administrative remedies.

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion to dismiss. A separate order accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

January 9, 2019

---

[12] The Court does not consider whether the same exhaustion analysis applies to count II.